**Opinion filed November 29, 2012**



## In The

# Eleventh Court of Appeals

_____

### No. 11-10-00329-CR
_____

## RICHARD GEORGE BAKER, JR., Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 35th District Court
Brown County, Texas
Trial Court Cause No. CR20132**

### M E M O R A N D U M   O P I N I O N

Appellant, Richard George Baker, Jr., pleaded not guilty to the offense of burglary of a habitation with the commission of a sexual assault, and he was tried jointly with his codefendant, Johnathen Lee Harrison. *See* TEX. PENAL CODE ANN. § 30.02 (West 2011). The jury found both men guilty. After the trial court found an enhancement paragraph in appellant's indictment to be true, the trial court assessed punishment at confinement for sixty years. In his sole issue on appeal, appellant contends that the trial court abused its discretion when it denied his motion for mistrial because the prosecutor engaged in improper jury argument. We affirm.

The complainant, Kira Taylor, and her son went to Danessa Gomez's apartment to spend the night after Taylor's boyfriend was arrested for unpaid tickets. The women smoked

methamphetamine for hours—some of which Gomez gave to Taylor and some of which Taylor purchased. Taylor testified that, while she was at Gomez's apartment, Harrison called twice and asked if he and appellant could come over. Taylor had met Harrison a few days before at the home of her friend, Teresa, but did not know appellant. Harrison was also friends with Taylor's boyfriend, who is the father of Teresa's children.

Taylor testified that she did not know how appellant and Harrison got directions to Gomez's apartment that day; she had not given them directions. Gomez, however, testified that she gave Taylor permission to invite them, and she heard Taylor give them directions. After they arrived at Gomez's apartment, Harrison told Taylor that he was looking for someone with whom appellant could have sex. Taylor testified that she told them she was not interested.

Soon thereafter, Gomez wanted them to leave before their loud voices awoke the children. Although Gomez testified that Taylor had asked her if she would watch Taylor's son while Taylor left with appellant and Harrison, Taylor denied it. Taylor, her son, appellant, and Harrison left Gomez's apartment at the same time, which was around two in the morning.

Taylor testified that, soon after she arrived home and put her son in his bed, she heard a knock at the door. Taylor said she opened the door slightly and saw Harrison and appellant on the front porch holding forty-ounce beers. When Taylor told them that they could not come in, she said that Harrison pushed open the door and entered anyway. She testified that appellant held her arms while Harrison played a CD that he had brought with him. When she tried to get away, she said that Harrison pulled her by the hair from the dining room into the living room, took off her shirt, pulled down his pants, and told her to perform oral sex on him. At the same time this was going on, appellant penetrated her vaginally from behind with his penis. After another attempt to get away, Taylor said that appellant pushed her into a chair and continued to have sex with her until he ejaculated. But when Taylor tried to flee to the bathroom, Harrison again grabbed her by the hair, told her that he was not finished, and penetrated her vaginally with his penis; appellant sat on the couch and drank a beer. Taylor testified that once Harrison released her, but before he left, he said, "That's for Teresa."

Taylor called the police, reported the incident, and gave the police a description of the assailants' vehicle as well as their possible whereabouts. Harrison and appellant had tried to hide from the police at a friend's apartment, but the friend would not let them stay. As appellant and Harrison left the apartment complex, police recognized their vehicle, stopped it, and arrested

2

them. Appellant made a phone call while in the backseat of the patrol car, and the phone call was recorded. Appellant told the person on the other end of the conversation that he was going to the penitentiary for life. The officer who made the arrest testified that, after Taylor identified the men in an on-scene show-up and after he gave *Miranda*[1] warnings, Harrison made the following statement while in the patrol car:

> I don't care, Bro. I want to tell you what happened. Hell, yeah, we f----d that girl, but that s--t was consensual. . . . Check this out. I was trying to set my homeboy up with some p---y. I was also going to use that b---h to show my other homeboy she was cheating on him. That b---h thought she was going to give up p---y for some dope. After we f----d her, I told her I was going to tell her old man that she was cheating on him. She told me if we did that, she was going to call on us.

Shortly after appellant was booked into jail, a jailer saw him washing his penis with water at a sink in his cell.

An emergency room doctor examined Taylor. He noted two abrasions around the entry to her vagina in a location that would usually indicate "missionary style" sex. The doctor explained that "[t]ypically abrasions that you see in that area are usually due to forced vaginal penetration or a woman that's unreceptive to sexual contact" and that he would not expect to see that type of abrasion after consensual sex. On cross-examination, however, the doctor agreed that such abrasions do not always indicate sexual assault. He stated that this sort of abrasion could "sometimes be from trauma," such as an accident while riding a bicycle. Although the doctor said that such abrasions can occur when a woman is unreceptive to sexual activity, he testified that "unreceptive" can mean physically, emotionally, or mentally, including situations in which a woman wants to engage in sexual intercourse but is not sexually aroused, is menopausal, or has vaginal dryness. The doctor found no evidence of forced oral sex, and Taylor never told the doctor that she had been violated orally. The evidence did not show that her clothes were torn or that she had bruises or other visible signs of assault.

After both sides had rested and closed, the State waived its opening jury argument. Harrison's attorney argued first. He informed the jury that, after he sat down, he could not get up and say anything regardless of what the prosecutor "stands up and says, whether I believe that it is fair or unfair, . . . whether I believe that it's truthful -- or hang the truthfulness -- whether I believe he has misremembered what you heard from here." Harrison's attorney explained that,

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

when expert witnesses give testimony elicited by the prosecutor, defense attorneys "flesh it out" during cross-examination:

> He sat down, he made a blanket assertion the abrasions indicated rape. Then we talked about the head, the heart, and the genitalia are sometimes not in sync.
>
> Sometimes the head and the heart are willing -- or just the head is willing, but the genitalia are a little behind, and that's why KY is a wealthy company.
>
> We also talked about how face-to-face, man on top, woman on the bottom, vigorous sex can lead to the same abrasions.

The prosecutor objected that this was a misstatement of the doctor's testimony, and the trial court instructed the jury that "the lawyers will comment on the evidence that they heard and call it to the best of their ability. You're instructed to remember the testimony of all of the witnesses as you heard it from right there, the witness stand." Harrison's attorney continued his argument and told the jury that the abrasions were not necessarily an indication of sexual assault because they could also indicate consensual sex with inadequate lubrication. Appellant's attorney subsequently argued, "And so, maybe those abrasions are from consensual sex . . . the prosecutor may say those are rabbit holes that you go down and those are red herrings and he's trying to mislead you. No, I'm not. I'm trying to lead you where you need to go."

The State made its final jury argument after defense counsel completed their arguments, and during that final argument by the State, the following transpired:

> What about this medical evidence? This is what surprises me. It really does. Because I've done a lot of trials. . . . And [both defense counsel] start talking about this medical evidence -- and I don't know how else to say it, but just spin it -- that's what lawyers do -- spin it in their direction. I don't know. I think flat out lie about it.

Appellant's counsel objected to the prosecutor's "characterization of this lawyer lying." The attorneys approached the bench, where each defense counsel continued voicing his objection to being called a liar in front of the jury. Defense counsel also requested a mistrial. During the discussion at the bench, appellant's attorney stated, "Spinning things in the direction is a lawyer's responsibility." Appellant's attorney also stated that saying "spinning" is different from "saying it's a lie."

The trial court sustained appellant's and Harrison's objection but denied their motion for mistrial. The trial court also instructed the jury to disregard the prosecutor's last comment. The prosecutor continued his closing argument, first commenting without objection from defense

4

counsel that it is widely known that "lawyers spin things" and then addressing the doctor's testimony as he recalled it and the reasonable deductions therefrom. The prosecutor did not thereafter accuse defense counsel of lying.

Appellant complains that the trial court abused its discretion when it denied appellant's motion for mistrial. Specifically, appellant contends that a limiting instruction was insufficient to remove the prejudice caused by the prosecutor's allegation that the defense attorneys "flat out lie[d]" about the evidence. The State asserts that the argument "was simply a reasonable deduction from the evidence as the Prosecutor saw it from his opinion" and that the limiting instruction was sufficient because the prosecutor did not refer to appellant, bolster witness testimony, or repeat the comment.

When a trial court sustains an objection, instructs the jury to disregard, but denies a motion for mistrial, as here, we assume without deciding that the argument was improper and look only to whether the court abused its discretion when it denied the motion for mistrial. *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004). "A mistrial is the trial court's remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Id.* (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). While a prosecutor's "uninvited and unsubstantiated accusation of improper conduct directed at a defendant's attorney" unquestionably puts the case at risk, only the most egregious argument taints the jury to the extent that it warrants a mistrial. *Mosley v. State*, 983 S.W.2d 249, 258, 260 (Tex. Crim. App. 1998).

To determine whether this nonconstitutional error was reversible or harmless, we apply Rule 44.2(b) of the Texas Rules of Appellate Procedure. *Id.* at 259. In applying that rule to an improper jury argument, we consider "(1) [the] severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) [the] measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction)." *Id.* To the extent possible, our review must calculate the probable impact of the error on the jury in light of the record. *Orona v. State*, 791 S.W.2d 125, 130 (Tex. Crim. App. 1990). Whether there was overwhelming evidence, or a lack thereof, does not dictate our analysis; instead, we focus on the error's effect on the trial. *Id.* We examine "the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral

implications." *Id.* We also consider "whether declaring the error harmless would encourage the State to repeat it with impunity." *Id.*

With respect to the first factor, "[p]rejudice is clearly the touchstone of the first factor in the *Mosley* test." *Hawkins*, 135 S.W.3d at 77. In assessing severity of a prosecutor's arguments, we do not consider them in isolation from the question of whether the argument had a prejudicial effect. *Id.* at 78. Prosecutors' arguments that "attack the personal morals or trustworthiness of defense counsel are manifestly improper because they undermine the adversarial system by unfairly prejudicing the jury against the defendant's attorney." *Fuentes v. State*, 991 S.W.2d 267, 274 (Tex. Crim. App. 1999). But when the jury is "in a position to evaluate the truthfulness of the prosecutor's assertion," the prejudice from improper argument may be minimized. *Mosley*, 983 S.W.2d at 260. In fact, when the jury is in such a position, the prosecutor's comments could "backfire if the jury disagrees with the prosecutor's assessment of defense counsels' actions." *Id.*

In the present case, we cannot hold that the prejudice stemming from the prosecutor's improper comment in this case warranted a mistrial. Harrison's counsel had already alluded to the prosecutor's "truthfulness." The prosecutor did not accuse the defendants of lying, did not accuse defense counsel of manufacturing evidence, did not argue outside the record, did not inject new facts into the record, and did not repeat the complained-of comment. As in *Mosley*, the jury in this case was in a position to evaluate the accuracy of the prosecutor's argument. The jurors had the doctor's testimony before them and were able to discern it for themselves. Also as in *Mosley*, we cannot find that the first factor weighs heavily in appellant's favor. *See id.* at 260.

As for the second factor, an instruction to disregard is generally sufficient to cure the prejudice from an improper argument. *Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995) (where the prosecutor argued that defense counsel "wants to mislead you a little bit"); *McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989). We presume that the jury followed the trial court's instruction to disregard.

We cannot hold under the record in this case that the third factor, the certainty of appellant's conviction absent the prosecutor's improper argument, weighs heavily in favor of either side. Although we agree with appellant that the evidence in this case was not overwhelming and that the medical evidence may have been—as the State put it—"the critical evidence in the case," we do not agree with appellant that the prosecutor's comment, which

improperly cast aspersion on the veracity of defense counsel with respect to the contents of the doctor's testimony, affected the outcome of this case. Appellant asserts "that if defense counsel would not have been called liars as it relates to the medical evidence, that there is a substantial likelihood the verdict would have been not guilty." The jury heard the doctor's testimony relating to the medical evidence and, presumably, judged the weight and credibility of that evidence for itself. Furthermore, during its deliberations, the jury requested the doctor's medical report, and the exhibit containing that report was delivered to the jury. We hold that the error in this case was harmless under Rule 44.2(b) as applied through the *Mosley* factors for improper jury argument and that the argument was not so egregious as to warrant a mistrial.

Although we have found no reversible error in connection with the State's jury argument, we are not to be taken to approve the argument in any way. As other courts have expressed, we fail to understand why prosecutors continue to make arguments of this nature. *See, e.g.*, *Wilson v. State*, 938 S.W.2d 57 (Tex. Crim. App. 1996), *abrogated on other grounds by Motilla v. State*, 78 S.W.3d 352, 356–57 & n.26 (Tex. Crim. App. 2002). That is especially so in the face of a plethora of cases in which the courts of this State consistently have held that such arguments clearly are out of bounds. We are not unmindful of the pace and stress of trial. However, one would think that, even in the "heat of battle," the risk of retrial would be caution enough to yield to cooler passions. The argument in this case is held to result in harmless error; that will not always be the case.

For the reasons we have stated in this opinion, appellant's issue is overruled.

The judgment of the trial court is affirmed.

JIM R. WRIGHT

CHIEF JUSTICE

November 29, 2012

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Gray, C.J., 10th Court of Appeals.[2]

---

[2]Tom Gray, Chief Justice, Court of Appeals, 10th District of Texas at Waco, sitting by assignment to the 11th Court of Appeals.

7